AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

District of Colorado

| | | |
|---|---|---|
| United States of America | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No.    24-mj-00065-STV |
| RODERICK A. PRESCOTT, | ) | |
| *Defendant* | ) | |

## CRIMINAL COMPLAINT

I, the undersigned complainant in this case, state that the following is true to the best of my knowledge and belief:

From February 2018 to September 2023, in the State and District of Colorado and elsewhere, Roderick A. Prescott did, for financial gain, unlawfully, voluntarily, and knowingly conspire and agree to conspire to defraud the United States with Larry E. Conner and Timothy A. McPhee, both of whom charged elsewhere (namely, *United States v. Larry Conner et al.*, No. 1:23-CR-390-RMR (D. Colo.), ECF No. 1), together with others known and unknown, by impeding, impairing, obstructing, and defeating the lawful Government functions of the Internal Revenue Service of the U.S. Department of the Treasury in the ascertainment, computation, assessment, and collection of the revenue, namely, federal individual income taxes, in violation of Title 18, United States Code, Section 371.

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 371 | Conspiracy to defraud the United States |

This criminal complaint is based on these facts:

See Affidavit attached hereto and herein incorporated by reference.

☒ Continued on attached sheet.

.

_____
*/s/ Jake Rice*
*Complainant's signature*

_____Jake Rice, Special Agent, IRS-CI_____
*Printed name and title*

Sworn to before me and:    ☐ signed in my presence.
☒ submitted, attested to, and acknowledged by reliable electronic means.

Date: __April 12, 2024__

City and state: __Denver, Colorado__

_____
*Judge's signature*

_____Hon. Scott T. Varholak, U.S. Magistrate Judge_____
*Printed name and title*

DEFENDANT: Roderick A. Prescott

YOB: 1953

OFFENSE(S): 18 U.S.C. § 371 – Conspiracy to defraud the United States

LOCATION OF OFFENSE (COUNTY/STATE):    Denver County

PENALTY:    NMT 5 years' imprisonment; NMT $250,000 fine; $100 Special Assessment

AGENT: IRS-CI Special Agents Jake Rice, David Guest, and Mike Garvey

AUTHORIZED BY:  Amanda R. Scott, Trial Attorney, Tax Division W-CES
                Lauren K. Pope, Trial Attorney, Tax Division W-CES
                Corey J. Smith, Senior Litigation Counsel, Tax Division W-CES

ESTIMATED TIME OF TRIAL:

_____ five days or less     __X__ over five days     _____ other

THE GOVERNMENT

_____ will seek detention in this case pursuant to 18 U.S.C. § 3142(f)(2)

__X__ will not seek detention

The statutory presumption of detention is or **is not applicable** to this defendant.

**AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT**
**SPECIAL AGENT JAKE RICE**

*United States v. Roderick A. Prescott*

I, Jake Rice, being duly sworn, state as follows:

**<u>INTRODUCTION</u>**

1.      I have been investigating RODERICK PRESCOTT ("PRESCOTT"), LARRY CONNER ("CONNER"), TIMOTHY MCPHEE ("MCPHEE"), CO-CONSPIRATOR 1 ("CC-1"), ACCOUNTANT 1 ("AC-1"), and RETURN PREPARER 1 ("RP-1") (collectively, the "CO-CONSPIRATORS"), and others known and unknown, for promoting, selling, and implementing for their own financial gain a fraudulent tax shelter (hereinafter, the "Abusive-Trust Tax Shelter"). In short, the Abusive-Trust Tax Shelter utilizes a series of sham trusts, including a purported charitable trust referred to as a "private family foundation," designed to conceal a taxpayer's income. Taxpayers were instructed to assign the bulk of their income to these sham trusts to create the illusion that the income assigned to the trusts was not owned and controlled by the taxpayers. In reality, however, the trusts were nothing more than an extension of the taxpayers themselves, designed to hold income the taxpayers earned, controlled, and used. In total, the CO-CONSPIRATORS caused the filing of over one thousand false and fraudulent federal income tax returns by more than one hundred taxpayers nationwide who purchased and used the Abusive-Trust Tax Shelter (hereinafter, the "clients"). Those false tax returns substantially underreported the clients' true income and, collectively, sheltered nearly $157,400,000 in income. As a result, the CO-CONSPIRATORS caused a loss to the United States of over $44,000,000 in unpaid federal income taxes.

2.      As described in more detail below, the investigation has determined that, from at least February 2018 to September 2023, PRESCOTT, through his business, THE STEWARDSHIP

INSTITUTE ("TSI"), promoted the Abusive-Trust Tax Shelter and advised clients who purchased the fraudulent tax shelter how to use the so-called "private family foundation" to evade federal income tax. PRESCOTT and CONNER, along with others, co-hosted workshops throughout the United States and abroad to promote the Abusive-Trust Tax Shelter, recruit clients, and procure the filing of materially false federal income tax returns. PRESCOTT further oversaw the preparation of instruments purporting to create "private family foundations" for CONNER's and MCPHEE's clients who purchased the purported foundation. PRESCOTT did so despite being permanently enjoined from organizing, promoting, marketing, or selling any abusive tax shelter in 2003. To conceal his prior injunction from clients, PRESCOTT used the alias "Rick Scott" in email correspondence, and he also used CC-1 as an intermediary when communicating with clients via email about the private family foundations and trusts. PRESCOTT benefitted significantly from his role in the scheme: between February 2018 and July 2023, he earned over $1,100,000.

3.       The information set forth in this Affidavit is based upon my personal observations and investigation; my training and experience; my conversations with, and information obtained from, other law enforcement officers; subpoenaed records from financial institutions and other individuals and entities; federal tax returns and other IRS records relating to CONNER, MCPHEE, PRESCOTT, CC-1, RP-1, AC-1, and others, including Abusive-Trust Tax Shelter clients; witness interviews; grand jury transcripts; records obtained from search warrants issued in the District of Colorado and executed on email accounts controlled by CONNER, MCPHEE, PRESCOTT, CC-1, RP-1, and others (*see United States v. Conner et al.*, 1:23-CR-390-RMR (D. Colo.), Dkt. 56-1 (listing cases); *In re Search Warrant*, 1:24-SW-025-SBP (D. Colo. Jan. 5, 2024)); and records obtained from search warrants issued in the Central District of California, District of Colorado, District of Montana, District of Nevada, and Eastern District of Texas, which were executed at the

residences of CONNER, MCPHEE, and AC-1, and the business offices of RP-1 and others on September 22, 2023.

4.	All observations I did not personally make were relayed to me by the individual who made them. When I write that a financial transaction occurred, an email was transmitted, or an event occurred on a specific date, I mean that the transaction occurred, the email was transmitted, or the event occurred on or about the date specified. This Affidavit contains information necessary to support probable cause, is based on facts known to me at this time, and is not intended to contain all information known by me or the government.

5.	I submit this Affidavit in support of a criminal complaint and arrest warrant charging PRESCOTT with conspiring with CONNER, MCPHEE, CC-1, AC-1, RP-1, and others, known and unknown, to defraud the United States by impeding, impairing, obstructing, and defeating the lawful government functions of the Internal Revenue Service ("IRS") of the U.S. Department of the Treasury in the ascertainment, computation, assessment, and collection of the federal individual income taxes of U.S. taxpayers nationwide, in violation of 18 U.S.C. § 371.

<u>**AFFIANT'S BACKGROUND, TRAINING, AND EXPERIENCE**</u>

6.	I am a Special Agent with Internal Revenue Service, Criminal Investigation ("IRS-CI") in the Denver field office. I have been employed in that capacity since September 2014.

7.	As a Special Agent, my duties are to investigate potential criminal violations of Internal Revenue laws under Title 26 of the United States Code and other related offenses under Titles 18 and 31 of the United States Code. Throughout my career, I have conducted numerous criminal investigations of individuals and businesses, during which I have gained experience and familiarity with the above sections of the United States Code. While performing my duties, I have participated in the execution of numerous search warrants, arrest warrants, and undercover

operations; prepared memoranda and reports; analyzed bank records, tax returns, and other financial records; conducted interviews; and testified in criminal proceedings.

8.      My training included six months at the Federal Law Enforcement Training Center ("FLETC") in Brunswick, Georgia. While there, I completed the Criminal Investigator Training Program and the Special Agent Investigative Techniques Program. During those programs, I studied a variety of law enforcement, criminal investigator, and tax crime issues, including search and seizure, violations of the Internal Revenue laws, and IRS procedures and policies in criminal investigations. I have also been certified by FLETC as a Use of Force Instructor.

9.      Prior to joining IRS-CI, I earned a Bachelor of Science in Crime and Society from Southwest Missouri State University.

### PROBABLE CAUSE

At all times relevant to this Affidavit:

#### Relevant Individuals and Entities

10.      CONNER, a conspirator charged in *United States v. Conner et al.*, 1:23-CR-390-RMR (D. Colo.), Dkt. 1, was a resident of the state of Kansas and Frisco, Texas. From at least 2016 through September 2023, CONNER promoted, sold, and implemented the Abusive-Trust Tax Shelter to clients nationwide in the name of THE BUSINESS SOLUTIONS GROUP ("TBSG").

11.      MCPHEE, a conspirator charged in *United States v. Conner et al.*, 1:23-CR-390-RMR (D. Colo.), Dkt. 1, was a resident of Estes Park, Colorado. From at least February 2017 through at least September 2023, MCPHEE co-owned and operated a business called PRIVATE BANKING CONCEPTS ("PBC") with his spouse, through which he promoted the Abusive-Trust Tax Shelter and other purported financial strategies.

4

12.     PRESCOTT was a resident of Oceanside, California and Mesquite, Nevada. From at least December 2005 through at least 2023, PRESCOTT owned and operated TSI, through which he promoted and sold purported "private family foundations" to clients nationwide. PRESCOTT organized TSI as a purported charitable trust. According to the trust instrument creating TSI, PRESCOTT named CC-1 and himself as TSI's trustees.

13.     CC-1, an unindicted conspirator, was a resident of Lincoln, California. From at least 2005 through 2023, CC-1 drafted purported private foundation instruments and promotional materials for TSI, among other duties.

14.     AC-1, an unindicted conspirator, was a resident of Kalispell, Montana. From in or around 2008 through at least 2023, AC-1 owned and operated an accounting and bookkeeping business (referred to as "ACCOUNTING FIRM"), which provided services to clients nationwide for a fee from offices in Kalispell, Montana and Cheyenne, Wyoming.

15.     RP-1, an unindicted conspirator, was a Certified Public Accountant licensed in California since at least 1997. From in or around 2012 through at least 2023, RP-1 owned and operated a tax return preparation business (referred to as "TAX FIRM"), which provided services to clients for a fee from offices in South Lake Tahoe, California and Gardnerville, Nevada.

16.     From in or around January 2020 until in or around September 2023, AC-1 and RP-1 co-owned and operated a business through which they jointly offered ACCOUNTING FIRM's bookkeeping services and TAX FIRM's tax-return preparation services to Abusive-Trust Tax Shelter clients nationwide for a fee.

Related Indictments

17.     On September 6, 2023, a federal grand jury in Denver, Colorado returned a fifteen-count indictment charging CONNER and MCPHEE with federal tax crimes. *See United States v. Larry Conner et al.*, 1:23-CR-390-RMR (D. Colo.), Dkt. 1. Specifically, the indictment charged

5

CONNER and MCPHEE with conspiring to defraud the United States, in violation of 18 U.S.C. § 371, by promoting, selling, and implementing the Abusive-Trust Tax Shelter for clients nationwide from early 2017 through September 2023. *Id.* at ¶¶ 39–105. The indictment further charged CONNER and MCPHEE with eight counts of aiding and assisting in the preparation of materially false tax returns filed on behalf of clients who purchased and used the Abusive-Trust Tax Shelter. *Id.* at ¶¶ 106–07. The indictment also charged MCPHEE and his spouse, Marcia Predmore, with six counts of tax evasion based on their personal use of the Abusive-Trust Tax Shelter to conceal income from the IRS and avoid paying taxes on income earned. *Id.* at ¶¶ 108–19.

18. IRS-CI special agents arrested CONNER in Frisco, Texas on September 22, 2023, and he appeared before Magistrate Judge Aileen Durrett in the Eastern District of Texas for his initial appearance that afternoon. MCPHEE was arrested on September 24, 2023, and appeared before Magistrate Judge Susan Prose for an initial appearance and arraignment on September 25, 2023. CONNER was arraigned in the District of Colorado on October 6, 2023.

19. On November 9, 2023, a federal grand jury sitting in Sherman, Texas, returned a seven-count indictment charging CONNER with additional federal tax crimes. *See United States v. Larry E. Conner*, 4:23-CR-259-SDJ (E.D. Tex.), Dkt. 2. That indictment charged CONNER with five counts of tax evasion, in violation of 26 U.S.C. § 7201, based on his personal use of the Abusive-Trust Tax Shelter to conceal from the IRS and avoid paying taxes on all income he earned through TBSG. *Id.* at ¶¶ 74–75. The indictment also charged CONNER with an additional count of tax evasion, in violation of 26 U.S.C. § 7201, and one count of corruptly endeavoring to obstruct or impede the due administration of the Internal Revenue Code, in violation of 26 U.S.C. § 7212(a),

6

based on his filing of a false financial disclosure form, which caused the IRS to forgive over $110,000 in tax debt that he incurred for tax years 2007 and 2009 through 2014. *Id.* at ¶¶ 76–79.

<u>Tax Rules for Trusts and Charitable Organizations</u>

20.    The IRS was an agency of the U.S. Department of Treasury responsible for enforcing and administering the tax laws of the United States and collecting taxes owed to the United States. Federal tax laws required every U.S. citizen and resident ("taxpayer") who received income exceeding the minimum filing amount established by law for a particular tax year to make and file annually a Form 1040, U.S. Individual Income Tax Return ("Form 1040"), wherein a taxpayer reported certain required items, including income, deductions, and any tax due and owing.

21.    For the purposes of federal taxation, income generally included, among other items, compensation for services performed by a taxpayer and income generated by a taxpayer's trade or business. Income that was earned by one person could not be assigned to another individual or entity for federal income tax purposes. That is, the person who *earned* income in any given year was required to pay tax on that income, even if he or she gave the right to *receive* the income to another person or entity, including a trust.

22.    A trust was an arrangement "whereby trustees [took] title to property for the purpose of protecting or conserving it for the beneficiaries[.]" 26 C.F.R. § 301.7701-4(a). A trust involved three distinct parties: The "grantor" was the party that initially conveyed money, property, or other assets to the trust and thereby relinquished legal title of the property to the trust. The "beneficiary" was the party that benefited from assets conveyed to the trust. The "trustee" was the party responsible for managing the trust's assets for the benefit of the beneficiary.

23.    All income generated or received by a trust was subject to federal income tax. Depending on who controlled and benefited from the trust's income and assets, either the trust, the beneficiary, and/or the grantor had to pay federal income tax on the trust's income. If the grantor

*retained* the power to control and direct the trust's income and assets—including for his or her own benefit and enjoyment—the IRS treated the trust as a "grantor trust." Income earned by a grantor trust was taxed to the grantor, meaning that the grantor was required to report such income on the grantor's Form 1040 and pay any federal income tax owed on that income. This was because the IRS treated the grantor as the owner of all the trust's assets. *See* 26 U.S.C. §§ 671–677.

24.     When the grantor *relinquished* the power to control and direct the trust's assets and income and instead conveyed that power to an independent trustee, the IRS treated the trust as a "non-grantor trust." In this arrangement, the trust was treated as a separate taxpayer from the grantor. As such, the trustee generally had to make and file annually a Form 1041, U.S. Income Tax Return for Estates and Trusts ("Form 1041") on the non-grantor trust's behalf to report certain required items, including income, deductions, and any tax due and owing. The trustee also was required to pay any federal income tax owed on the trust's behalf.

25.     The Internal Revenue Code allowed non-grantor trusts to claim certain federal tax deductions on its Form 1041 to reduce its taxable income. When applicable, the trust could deduct (1) the costs incurred administering the trust that would not have been incurred if the trust assets were not held by the trust and/or (2) distributions paid to its beneficiaries. *See* 26 U.S.C. §§ 67(e), 661. Distributions from a trust to its beneficiaries were taxable to the beneficiary, meaning that the beneficiary was required to report the distribution as income on the beneficiary's tax return and pay any federal income tax owed on that distribution.

26.     The Internal Revenue Code also allowed taxpayers, including non-grantor trusts, to claim a tax deduction for charitable donations made within any given tax year. To claim a charitable donation tax deduction, the trust, individual, or other taxpayer had to completely

8

relinquish dominion and control over the donated property and could not retain enjoyment of the donation or otherwise expect a substantial benefit in return.

27.    A charitable organization was an entity organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, educational, or other purposes specified in the Internal Revenue Code and that, if it met certain other requirements, could be tax-exempt under Internal Revenue Code Section 501(c)(3). An organization was not tax-exempt under the Internal Revenue Code if any part of the net earnings inured to the benefit of any private shareholder or individual.

28.    To apply for federal tax-exempt status, a charitable organization had to file a Form 1023, Application for Recognition of Exemption Under Section 501(c)(3) of the Internal Revenue Code ("Form 1023") or Form 1023-EZ, Streamlined Application for Recognition of Exemption Under Section 501(c)(3) of the Internal Revenue Code ("Form 1023-EZ").

29.    An Exemption Determination Letter was a letter that the IRS issued to an organization if its Form 1023 or Form 1023-EZ and supporting documents established that it met the particular requirements of the section under which the organization claimed tax-exempt status. The IRS issued Exemption Determination Letters based on the representations made in the organization's application and supporting documents. If the organization did not operate exclusively for one or more purposes set forth in the Internal Revenue Code but represented on its application and supporting documents that it did, that organization was not tax-exempt.

30.    A private foundation was an organization that could achieve federal tax-exempt status if it was organized and operated exclusively for one or more of the charitable purposes set forth in the Internal Revenue Code. Private foundations could be organized as a corporation or a

9

trust and were controlled by the foundation manager designated under the foundation's articles of incorporation, bylaws, or trust instrument.

31.    A private foundation generally was required to file with the IRS an annual information return called a Form 990-PF, Return of Private Foundation ("Form 990-PF") to report information regarding, among other information, contributions the foundation received during a given tax year, including donations made by trusts or other entities, and the foundation's assets, charitable distributions, and charitable activities.

Background on Abusive Trusts

32.    The IRS had published notices and guidance to warn taxpayers about marketed "abusive trust arrangements," which falsely claimed to avoid federal income tax. *See, e.g.*, IRS Gen. Couns. Mem. AM 2023-006; IRS Notice 97-24, 1997-1 C.B. 409. Often, promoters of these schemes falsely promised that taxpayers could use trusts to substantially reduce or eliminate their taxable income and deduct personal expenses—all without any meaningful change in the taxpayer's control over or benefit from income and assets nominally assigned to the taxpayer's purported trusts.

33.    Just because a promoter or taxpayer labelled an arrangement as a "trust" did not mean that it would be taxed as such. It was a "fundamental tax principle" that an entity or transaction would be taxed based on its economic substance, not its form. *Rogers v. United States*, 281 F.3d 1108, 1116 (10th Cir. 2002). The creation of a trust had economic substance if it met two requirements: First, the transaction must have meaningfully changed the taxpayer's economic position apart from federal income tax effects and, second, the taxpayer must have had a substantial purpose apart from tax avoidance for entering such transaction. 26 U.S.C. § 7701(o)(1)(A)–(B). If a purported non-grantor trust lacked economic substance, the IRS deemed the trust to be a "sham trust" and reassigned the trust's income to the grantor in his or her individual capacity. The grantor

10

was then responsible for reporting the trust's income on a Form 1040 and paying any federal income tax due on that income.

<u>The Abusive-Trust Tax Shelter Conspiracy</u>

34.    From at least February 2018 to September 2023, CONNER, MCPHEE, PRESCOTT, CC-1, AC-1, and RP-1, acting interdependently and with others known and unknown, conspired to defraud the United States by promoting, selling, and implementing the Abusive-Trust Tax Shelter for their own financial gain. In summary, the evidence I have reviewed shows the following, which are discussed in greater detail in the sections below:

a.    The Abusive-Trust Tax Shelter was a multi-tiered trust structure virtually identical to the "abusive trust arrangements" described in published IRS notices and guidance.

b.    The CO-CONSPIRATORS promoted the Abusive-Trust Tax Shelter at workshops throughout the United States and abroad.

c.    PRESCOTT benefitted financially from his role in promoting the Abusive-Trust Tax Shelter by operating the business that drafted purported private family foundation instruments for clients who purchased the so-called foundation from CONNER.

d.    Hundreds of false and fraudulent federal income tax returns were filed with the IRS as part of this tax fraud conspiracy. Those tax returns were fraudulent because they falsely reported income earned by the clients individually on Forms 1041 filed in the name of the clients' sham trusts. In reality, however, the clients earned, controlled, and benefitted from the funds nominally held in the name of their sham trusts. Accordingly, that income should have been reported on the clients' Forms 1040, and the clients should have paid federal income tax on the income fraudulently diverted to their sham trusts.

11

e.    PRESCOTT provided clients who purchased the purported foundation from CONNER with ongoing advice and guidance regarding how to use the so-called "private family foundation" to avoid paying federal income tax.

f.    PRESCOTT voluntarily participated in this this tax fraud conspiracy knowing that the Abusive-Trust Tax Shelter was nearly identical to the abusive trust structure that PRESCOTT was permanently enjoined from promoting, marketing, and selling in 2003 and that he was convicted for personally using in 2009.

*Structure and Mechanics of the Abusive-Trust Tax Shelter*

35.    The Abusive-Trust Tax Shelter involved a multi-tiered trust structure typically consisting of three sham trusts and a purported charitable foundation that was also organized as a trust. The sham trusts were successively layered, meaning that each trust named the next trust in the series as its beneficiary. In email communications and promotional materials, the CO-CONSPIRATORS referred to the sham trusts as a "business trust," a "family trust," and a "charitable trust," and referred to the purported charitable foundation as a "private family foundation."

36.    CONNER and MCPHEE marketed the Abusive-Trust Tax Shelter with the false promise that prospective clients could eliminate taxes on nearly all their annual business income using the tax shelter. The government's investigation, which included multiple undercover operations, captured recorded statements made by CONNER and MCPHEE to this effect. Specifically, CONNER and MCPHEE advised that the Abusive-Trust Tax Shelter worked as follows:

a.    First, clients, most of whom were successful business owners, would nominally assign 98% ownership of their business to a sham business trust to create the illusion that the business income corresponding to the ownership percentage assigned to such trust was not

earned by the client. CONNER and MCPHEE assured clients and prospective clients that despite the reassignment of business ownership and income, the clients' business operations would not change and that the clients, as trustees, would retain complete control over their businesses and the income that their businesses generated. During a workshop attended by an undercover agent on January 28th and 29th, 2023, MCPHEE admitted to attendees that the ownership percentages between a client's business and sham business trust were meaningless: "I control the LLC. I control the foundation. I control the… all of it, so I… I can set that up the way I want, and now, if I want it, I can set it up 50-50. I can set it up 95-5. I can set it up 5-95. I can set it up any way I want."

b.   Then, clients would open bank accounts in the name of their sham trusts and foundations, which they would control and have signing authority over. The CO-CONSPIRATORS told clients to pay for personal expenses with funds held in those accounts to create the illusion that such expenses were expenses of the trusts and foundations, not personal expenses.

c.   To conceal the income assigned to the sham trusts from the IRS, the clients would typically report only 2% of their income on their Form 1040 and pass the remaining 98% through the series of layered sham trusts and so-called foundation. Specifically, the client would report 98% of their business income on a Form 1041 filed on behalf of the sham business trust. Thereafter, the "business trust" would purport to distribute its net income to the "family trust," which, in turn, would purport to distribute its net income to the "charitable trust." Finally, the charitable trust would claim to "donate" any remaining income to a purported "private family foundation," which would not pay any tax on received funds or assets because it claimed to be a tax-exempt charity.

d. Each sham trust in the series would report fraudulent tax deductions matching (or exceeding) the income reported on its Form 1041. For example, the tax returns for the sham trusts would fraudulently deduct personal expenses, which would not normally be deductible on Forms 1040, as expenses of the trust. The trust tax returns would also fraudulently claim deductions for the so-called charitable donations purportedly made to the client's private family foundation. However, the client would never relinquish complete dominion and control over the "donated" funds. CONNER and MCPHEE told clients they could access those funds anytime by causing the so-called charitable foundation to "loan" the funds back to the client's business, business trust, or family trust tax free. Thus, for any given year, regardless of the amount of income earned or received by a client, each trust reported $0 in taxable income and paid $0 in taxes.

e. As a result of this process, the clients would pay no tax on upwards of 98% of their income. Clients could, however, choose how much they wanted in pay in taxes by changing the income assignment percentages. As MCPHEE said during the January 2023 workshop mentioned above: "Do you want to pay taxes? Yes, you can. It doesn't have to be zero. It's up to you. It's in your control."

*The Abusive-Trust Tax Shelter Workshops*

37. The CO-CONSPIRATORS promoted the Abusive-Trust Tax Shelter at in-person seminars and workshops held across the country and abroad. CONNER hosted these seminars in the name of TBSG and a firm referred to here as "TRUST PROMOTER FIRM," which was a business owned and operated by CO-CONSPIRATOR 2 ("CC-2") that prepared and distributed trust documents to clients who purchased the sham trusts from CONNER. MCPHEE hosted seminars promoting the Abusive-Trust Tax Shelter in the name of PBC. CONNER and MCPHEE

typically charged an attendance fee at the seminars, which they taught together and separately, including in the District of Colorado on February 1st and 2nd, 2020 in Denver.

38.    PRESCOTT often co-hosted seminars with CONNER, during which he taught about the purported "private family foundation," advertised by CONNER and MCPHEE as the final step of the Abusive-Trust Tax Shelter. In response to a federal grand jury subpoena, CC-1 wrote a letter stating that CONNER, PRESCOTT, and CC-2 made "an agreement . . . [to] share a weekend workshop." CONNER also admitted that he and PRESCOTT regularly did workshops together during a voluntary interview with IRS-CI while in custody on September 22, 2023.

39.    Emails and text messages obtained via search warrants confirm that CONNER and PRESCOTT, sometimes with CC-1 and CC-2, co-hosted workshops between at least 2018 and 2023. For example, on March 25, 2019, CONNER texted CC-1: "Thank you my friend for a job well done.!! Let Rick [PRESCOTT] know everyone was fired up with his presentation. I think this ranks up there with our best workshop." On May 30, 2023, PRESCOTT texted CONNER: "[CC-1] sent 52 workbooks on Friday and the balance today. The last batch is via air and scheduled to arrive Thursday. Latest Friday. I'm looking forward to seeing you guys and holding an awesome workshop."

40.    Similar records show that PRESCOTT and CONNER co-hosted workshops promoting the Abusive-Trust Tax Shelter on at least the following dates: December 1st and 2nd, 2018 in Irving, Texas; September 18th and 19th, 2021 in Irving, Texas; July 9th and 10th, 2022 in Frisco, Texas; February 5th and 6th, 2023 on a Caribbean cruise; and June 3rd and 4th, 2023 in Frisco, Texas.

*Set-Up Fees and Distribution of Proceeds*

41.    MCPHEE, AC-1, and RP-1 recruited and referred prospective clients to CONNER to purchase the Abusive-Trust Tax Shelter. CONNER typically charged clients between

approximately $25,000 and $50,000 to purchase the three sham trusts and purported private family foundation used to carry out the tax shelter. CONNER and MCPHEE sent instructions directing clients to pay these fees by wire transfer to a bank account purportedly held in the name of TBSG (the "TBSG Account"), which CONNER controlled and had signing authority over. Though clients paid CONNER directly to purchase the Abusive-Trust Tax Shelter, MCPHEE also benefitted financially from the conspiracy. Namely, when clients of PBC did not pay federal income taxes owed, they had more money to spend on the various financial "strategies" that PBC promoted and sold.

42.     In addition to paying the required fee, CONNER required that prospective clients fill out an application (the "TBSG Application") before purchasing the sham trusts and/or purported private family foundation.

43.     CONNER and MCPHEE relied on the assistance of PRESCOTT, CC-1, and CC-2 to draft the instruments purporting to create the sham trusts and foundations used to carry out the Abusive-Trust Tax Shelter and to send those instruments to the clients. Records obtained via search warrant, including email communications and client tracker logs prepared by CC-1, and statements made to the government by CONNER, CC-1, and CC-2's widow ("E.F.") reveal that this process worked as follows:

a.    First, CONNER emailed the clients' completed TBSG Applications to CC-1 and/or CC-2 for the preparation of the trust and foundation instruments, along with a cover letter (the "TSI Cover Letter") stating that CONNER would also send a cashier's check payable to various entities controlled by PRESCOTT, CC-1, and/or CC-2 for the trust and foundation instruments. Based on my review of TBSG Applications and TSI Cover Letters obtained via search

16

warrants, CONNER sent over 190 applications for the preparation of trust instruments, including for private foundations, between January 29, 2018 and June 28, 2022.

b. Then, CC-2 and/or E.F. prepared trust documents for any "business trust," "family trust," and "charitable trust" requested by CONNER on a client's behalf. They did so through TRUST PROMOTER FIRM. PRESCOTT and CC-1 were responsible for preparing the trust instruments through TSI for any private family foundation requested by CONNER.

c. Lastly, CC-1 printed and mailed the sham trust and private foundation instruments to the clients who purchased the Abusive-Trust Tax Shelter from CONNER.

44. CONNER purchased cashier's checks drawn from funds held in the TBSG Account and made those checks out to various entities controlled by PRESCOTT, CC-1, and CC-2 to pay a share of the clients' fees to PRESCOTT, CC-1, and CC-2. Specifically, CONNER typically paid $1,500 for a single sham trust, $4,000 for a package of three sham trusts, and $7,500 for a purported private family foundation.

45. Between August 25, 2016, and September 19, 2023, CONNER, PRESCOTT, CC-1, and CC-2 owned and/or controlled over ten financial accounts at various institutions, which they used to receive and distribute proceeds from selling the Abusive-Trust Tax Shelter. IRS-CI obtained financial statements and other records for those accounts in response to federal grand jury subpoenas and a search warrant executed at CONNER's residence. I reviewed those records and traced the history of financial transactions conducted using those accounts, which revealed:

a. From January 2016 through December 2021, CONNER received nearly $4,000,000 in deposits into the TBSG Account from clients who purchased the Abusive-Trust Tax Shelter. The memo lines for these wire transfers include labels that plainly reference the Abusive-

Trust Tax Shelter—for example, "setting up a trust," "for setting up private foundation and family trust," "trust payment," "foundation," and "trust."

b. From June 2016 through April 2023, CONNER paid approximately $2,340,374 in client fees to PRESCOTT, CC-1, and CC-2 for the preparation of trust and foundation instruments.

c. PRESCOTT generally received his portion of client fees indirectly through CC-1. From February 2018 through July 2023, CC-2 paid PRESCOTT approximately $1,100,431 by causing those funds to be deposited into bank accounts held in the name of TSI and OPEN ROAD FOUNDATION, which PRESCOTT controlled and had signing authority over. OPEN ROAD FOUNDATION was a purported private family foundation set up by PRESCOTT in May 2021.

*Bookkeeping and Tax Return Preparation*

46. CONNER and MCPHEE referred clients to handpicked accountants, bookkeepers, and tax return preparers, including AC-1, RP-1, RETURN PREPARER 2 ("RP-2"), and RETURN PREPARER 3 ("RP-3"). In so doing, CONNER and MCPHEE ensured that someone familiar with the Abusive-Trust Tax Shelter would provide bookkeeping and tax-return preparation services for clients consistent with their fraudulent methods. The clients paid these tax and accounting professionals directly for their services, which included, among others, the preparation and filing of false Forms 1040, Forms 1041, and Forms 990-PF.

47. AC-1 prepared, and directed her employees at ACCOUNTING FIRM to prepare, financial statements for clients using the Abusive-Trust Tax Shelter. Those financial statements reported, among other items, income and expenses for the clients' businesses, purported trusts, and purported private family foundations. AC-1 then shared, and directed her employees to share, those financial statements with TAX FIRM for use in the preparation of individual, business, trust, and

foundation tax returns for clients who used the Abusive-Trust Tax Shelter. Those financial summaries typically reported all money coming into trust bank accounts as "trust income" and all money spent from trust accounts—even if spent on personal expenses—as expenses of the trusts.

48.     The IRS identified over 1,500 false and fraudulent Forms 1040, Forms 1041, and Forms 990-PF filed and caused to be filed by RP-1, RP-2, and RP-3 for the clients who purchased the Abusive-Trust Tax Shelter. The Forms 1040 substantially underreported the clients' income, which resulted in the payment of far lower taxes by the clients. The Forms 1041 and Forms 990-PF fraudulently reported income that the clients earned, controlled, and benefitted from individually as income of the sham trusts and purported private foundations. The false Forms 1041 also fraudulently claimed deductions for personal and other non-deductible expenses incurred by the clients individually. As a result, virtually all returns prepared and filed, and caused to be prepared and filed, by RP-1, RP-2, and RP-3 for the clients' sham trusts claimed $0 in federal income taxes despite collectively reporting over $363,206,000 in income.

49.     Based on information currently available to the IRS, including federal tax returns and other IRS transcripts and records, the preparation and filing of these false and fraudulent tax returns fraudulently concealed from the IRS nearly $157,400,000 in income earned by the clients who purchased and used the Abusive-Trust Tax Shelter for tax years 2016 through 2022, which resulted in over $44,000,000 in unpaid federal income taxes.

*Prescott's Advice and Correspondence with Clients*

50.     PRESCOTT advised clients who purchased the Abusive-Trust Tax Shelter how to use the so-called private family foundation to avoid paying taxes on earned income. PRESCOTT instructed clients to "donate" income to their private family foundation and claim the amount donated as a deduction, thereby reducing the client's taxes owed. PRESCOTT further instructed clients to spend the funds "donated" to their private family foundation for their own personal use

and to disguise the transactions to make them appear charitable. PRESCOTT also counseled clients how to respond to IRS requests for information regarding Forms 1023 and Forms 1023-EZ submitted to the IRS by the clients seeking tax-exempt status for their purported private foundations.

51.    PRESCOTT used the alias "Rick Scott" in email correspondence and on private family foundation promotional materials to conceal his prior injunction and criminal conviction from clients, which are discussed further below. PRESCOTT also used CC-1 as an intermediary when communicating with clients via email about the private family foundations and trusts to further conceal those past legal troubles from clients. As CC-2 reminded CONNER in an email dated September 20, 2016, "Any correspondence concerning Rick [PRESCOTT] is handled through [CC-1]."

52.    Based on my review of email communications obtained via search warrants, this is how PRESCOTT typically communicated with TSI's clients: First, clients emailed their questions regarding the Abusive-Trust Tax Shelter and how to use it to CC-1. Then, CC-1 forwarded those emails to PRESCOTT, who started using an encrypted email account in the alias "Rick Scott" in December 2020. Next, PRESCOTT responded to the clients' questions in emails that he sent to CC-1. Finally, CC-1 copied and pasted PRESCOTT's response into a separate email that CC-1 sent to clients. This process created the illusion that CC-1 was answering the clients' questions about the fraudulent tax shelter when, in reality, PRESCOTT was.

53.    The following are some examples of PRESCOTT's email correspondence with clients regarding how to use the purported private family foundations, which reveal his understanding that the primary purpose of the Abusive-Trust Tax Shelter was to pay less federal income tax. The following statements also demonstrate PRESCOTT's understanding that the

20

clients would retain full dominion and control over the use and enjoyment of property transferred to their purported private family foundations.

a.   On July 13, 2017, PRESCOTT—using CC-1 as an intermediary—advised client J.S. how to quitclaim personal properties to a purported private foundation "so that it doesn't sound self promoting or self benefiting to the trustees." J.S. sought this advice because J.S. previously "called the Florida tax assessors office who were . . . pressing about the use of the house for the foundation." PRESCOTT advised J.S. to justify the so-called charitable donation to J.S.'s private foundation by claiming that "[t]he _____ Foundation is a qualified 501(c)(3) organization that charges no fees and conducts weekend religious retreats open to individuals of diverse Christian denominations at the site in application where the participants may enjoy the recreational facilities in their limited amount of free time."

b.   On December 11, 2017, PRESCOTT—using CC-1 as an intermediary—advised client D.G. that "the foundation can buy a car just as any entity can . . . Just make sure to put the title trustee after your name" on the vehicle's "title as well as the [foundation's name]." PRESCOTT provided this advice as a means "to minimize tax" when buying a personal vehicle.

c.   On July 25, 2018, PRESCOTT responded to client D.R.'s questions about how to "have the Foundation make loans to me personally and to my businesses to provide the money to payoff debts" and "avoid showing the influx of money as income." PRESCOTT advised D.R. to cause the foundation to make purported loans to D.R.'s businesses. PRESCOTT also explained that D.R. could avoid repaying the "loans" for years by establishing a "promissory note that can be renewed over time" without inviting "scrutiny" by the IRS.

d.   On January 21, 2020, PRESCOTT—using CC-1 as an intermediary—emailed client J.V. about a letter J.V. received from the IRS regarding the private family

21

foundation J.V. purchased from CONNER. PRESCOTT wrote: "Good morning [J.V.], Please find attached suggested responses to the letter from the IRS. You may use these responses as they are written. Although these IRS letter requests are infrequent they do on occasion occur as you are experiencing. There is no worries as it is part of the process for acquiring the determination letter for exempt status. Simply respond as I have indicated and you will be fine." PRESCOTT attached to the email a document that provided scripted responses to the IRS's questions about J.V.'s purported private family foundation.

e. On April 1, 2020, PRESCOTT—using CC-1 as an intermediary—emailed client J.H. a document titled "Audit explanation," which provided scripted responses to the IRS's questions about J.H.'s private family foundation that J.H. purchased from CONNER. In his email, PRESCOTT wrote: "Please find attached suggestions for the IRS questions. You may use them as you deem appropriate. They have always been sufficient in the past. Once you respond your determination letter for tax exemption will soon follow."

f. On August 12, 2020, PRESCOTT—using CC-1 as an intermediary—emailed client P.G. to explain that P.G. could loan funds from P.G.'s private family foundation to P.G.'s family trust and then use those funds to pay off P.G.'s daughter's student loans.

g. On August 28, 2020, PRESCOTT—using CC-1 as an intermediary—responded to questions posed by client P.S. regarding whether the IRS could "'trace' [P.S.'s foreign-sourced] money to [P.S.'s] personal SSN[.]" PRESCOTT told P.S. that "[o]nce it is in the trust it is not yours it belongs to the trust" and that afterward, P.S. could make an "anonymous" donation to P.S.'s private foundation to create the appearance that the purported donation "did not come from you personally[.]"

h. On March 30, 2021, PRESCOTT—using CC-1 as an intermediary—responded to the question, "I have a prospective client . . . interested in getting structured correctly (business trust, family trust, and pff). What is the best way for them to be structured and allow money to flow through to their private family foundation[?]" PRESCOTT's response included the following statements:

    i. "We always advocate the usage of a trust[;] you can simply reorganize the LLC to a trust by replacing the LLC governing document with a trust agreement."

    ii. "The private foundation stands alone as an entity. That being said, it can be a beneficiary of a trust[.]"

    iii. "Typically in a trust structure the foundation offers itself as another option for any of the trust for donations in place of distributions. A business trust is a business entity in trust form and engages in business type of activities. The family trusts [sic] main purpose is asset protection and estate planning."

    iv. "Their [sic] are many advantages" to "the trust form" including "self-governance, added privacy, flexibility, and control."

i. On April 7, 2021, PRESCOTT—using CC-1 as an intermediary—provided advice to CC-2 regarding how a client could use a private foundation to pay for tuition expenses for the client's children while concealing the true, self-dealing nature of such transaction. Specifically, PRESCOTT advised to "make your grant narrow without naming your child and you should be okay" so long as the grant is "stated in such a way that numerous parties COULD qualify."

23

j. On November 24, 2021, PRESCOTT—using CC-1 as an intermediary—emailed client T.F. approving of T.F.'s plan to "donate $100K" to T.F.'s private family foundation and then invest that money in T.F.'s business trust "a few days later" to reduce the tax penalty T.F. incurred from taking money out of certain accounts. PRESCOTT told T.F. that the plan was "reasonable" as it "allows you to use those funds to further your charitable interests." In his email response, PRESCOTT attached a document titled "standard promissory note" for T.F. to use to prepare a contract between T.F.'s business trust and private family foundation.

k. On December 9, 2021, PRESCOTT—using CC-1 as an intermediary—advised client T.F. to transfer via a quitclaim deed real estate property to T.F.'s purported private family foundation so T.F. could deduct the "interest and principle [sic] as charitable contributions" on T.F.'s individual income tax return.

l. On December 8, 2022, client S.M. emailed CC-1 stating, "we spoke on the phone a few weeks back about me trying to transfer our residence into the foundation[,]" and asking "what do I do if . . . I cant [sic] get an attorney who feels comfortable with this?" S.M. explained that he had "engaged a local attorney" who warned that if S.M. "continued to live in the Residence after transfer, this would constitute 'self dealing' under IRS rules . . . (i.e. the contributed property must be used only for 'charitable purposes'), potentially resulting in levying of an excise tax by the IRS and loss of the Foundation's tax exempt status." PRESCOTT—using CC-1 as an intermediary—replied, "[S.M.], it is my opinion that you will hard pressed to find an attorney who will encourage you to establish a foundation. Attorneys are more comfortable telling you what you can't do[.]" PRESCOTT assured S.M. that S.M. could continue living in S.M.'s home after the so-called donation by creating a phony document asserting that the client, as

24

trustee, was "required by the employer (foundation) as a condition of an employment contract" to live in the residence.

54.    Along with advising clients how to use the so-called private family foundation to evade paying income tax, PRESCOTT also provided CC-1 with template documents for the clients to use. The following are examples of these correspondence:

a.    On February 18, 2020, PRESCOTT emailed CC-1 with the subject line "Larry Connor," writing: "I have attached a trustee resignation letter template and an appointment letter template. As trustee you may alter, change or add as you see fit." PRESCOTT attached two template documents to the email, one titled "Appointment and Acceptance of Trustee" and the other titled "Resignation of Trustee."

b.    On January 3, 2022, PRESCOTT emailed CC-1 a document titled "MINUTES OF TRUSTEES 2022," which provided a template to document the minutes of a trustee meeting.

c.    On March 6, 2023, PRESCOTT emailed CC-1 a document titled "DECLARATION OF TRUST AGREEMENT," writing: "[CC-1], here is a foundation template with a family trust as the founder."

<u>Prescott's Permanent Injunction and Prior Conviction</u>

55.    On April 9, 2002, the United States filed a complaint seeking to enjoin PRESCOTT "from promoting an abusive tax scheme" involving "purported trusts, sometimes referred to as 'Irrevocable Complex Trusts,' 'Pure Trusts,' or purported 'Charitable Trusts,' and purported charitable foundations." *See United States v. Roderick A. Prescott et al.*, 3:02-CV-692-L-JFS (S.D. Cal.), Dkt. 1, ¶ 1. The complaint alleged that PRESCOTT marketed abusive trusts to hundreds of clients nationwide from at least 1988 through 2002 "for the primary purpose of evading taxes." *Id.*

at ¶¶ 9–11, 29. As a result, the IRS estimated that PRESCOTT caused "more than $135 million" in unpaid federal income taxes. *Id.* at ¶¶ 29–30.

56.    On June 2, 2003, PRESCOTT consented to the permanent injunction. *See United States v. Roderick A. Prescott et al.*, 3:02-CV-692-L-JFS (S.D. Cal.), Dkt. 41. Specifically, PRESCOTT agreed to be permanently enjoined—individually and doing business through any entity, their representatives, agents, servants, employees, attorneys, and those persons in active concert or participation with them—from, among other terms, directly or indirectly:

a.    "Organizing, promoting, marketing or selling purported non-grantor trusts, sometimes referred to as business, family, or holding trusts; and any other abusive tax shelter, plan or arrangement which advises or encourages customers to attempt to violate the internal revenue laws or unlawfully evade the assessment or collection of their federal tax liabilities[.]"

b.    "Organizing, selling or assisting in the organization of an entity or otherwise promoting any plan or arrangement based upon" the following false representations, among others:

i.    "customers may continue to control and receive the beneficial enjoyment from assets irrevocably transferred to trust without regard to the grantor trust rules provided by IRC §§ 673 through 677";

ii.    "maintenance and upkeep on a personal residence can be fully deducted by a trust for the purpose of improperly avoiding taxes"; and

iii.    "personal expenses incurred by customers can be paid though a trust in order to improperly obtain tax benefits not available to individuals[.]"

57.    The facts discussed in this Affidavit indicate that PRESCOTT has apparently violated that injunction since at least 2005 when he went into business promoting and selling purported private family foundations organized as trusts. Indeed, PRESCOTT clearly knew that the private foundations he promoted through TSI were trusts. For example, in an email dated March 26, 2023, PRESCOTT wrote: "Yes, the foundation is in trust form as [sic] is often referred to as a charitable trust."

58.    On June 29, 2005, a federal grand jury in San Francisco, California, returned a superseding indictment charging PRESCOTT with tax crimes relating to his prior promotion, sale, and personal use of the abusive-trust structure that resulted in his permanent injunction. *See United States v. Fritts et al.*, 3:05-CR-216-WHA (N.D. Cal.), Dkt. 4. That superseding indictment charged PRESCOTT with conspiring to defraud the United States and conspiring to commit tax evasion, in violation of 18 U.S.C. § 371, and two counts of tax evasion, in violation of 26 U.S.C. § 7201. The matter was later transferred to the U.S. District Court for the District of Oregon. PRESCOTT pleaded guilty to one count of tax evasion, and on October 29, 2009, the Court sentenced PRESCOTT to thirty months' imprisonment followed by three years' supervised release. *United States v. Roderick Alyn Prescott*, 6:05-CR-30067-AA (D. Ore.), Dkt. 205-2. The Court also ordered that PRESCOTT was not to "engage in the promotion or sale of any financial arrangement, financial production, financial advice, trust or foundation during the period of his supervised release." *Id.*

59.    The allegations in the Government's complaint to enjoin PRESCOTT and the superseding indictment discussed above describe a trust structure that is nearly identical to the Abusive-Trust Tax Shelter. First, each involved a multi-tiered trust structure involving a series of layered sham trusts such that each trust made distributions to the next. They also involved  a

27

purported tax-exempt private foundation set up to receive "donations" from those trusts. Clients of both schemes also were instructed to transfer their businesses to "business trusts" and their homes to "family trusts" and were promised that, despite making such transfers, clients would retain complete control over any asset purportedly transferred to their sham trusts. Further, clients were falsely promised that they could transform non-deductible personal expenses into tax-deductible expenses by using the marketed abusive-trust packages.

## CONCLUSION

60.    Based on the information set forth above, I submit that probable cause exists to conclude that from in or around February 2018 to September 2023, within the District of Colorado and elsewhere, PRESCOTT conspired with CONNER, MCPHEE, CC-1, AC-1, RP-1, and others, known and unknown, to defraud the United States by impeding, impairing, obstructing, and defeating the lawful government functions of the IRS of the U.S. Department of the Treasury in the ascertainment, computation, assessment, and collection of the federal individual income taxes of U.S. taxpayers nationwide, in violation of 18 U.S.C. § 371.

### END OF SWORN STATEMENT

JAKE RICE
SPECIAL AGENT
IRS CRIMINAL INVESTIGATION

Attested to by the applicant in accordance with the requirements of Federal Rule of Criminal Procedure 4.1 by ___telephone___ on this __12th__ day of April 2024.

HON. SCOTT T. VARHOLAK
UNITED STATES MAGISTRATE JUDGE

28